IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  11-cv-00477-LTB

RUSSELL A. GUSTAFSON,

      Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

      Defendant.

_____

ORDER
_____

Plaintiff Russell A. Gustafson appeals from the Social Security Administration Commissioner's (the "Commissioner"), final decision denying his application for disability insurance benefits, filed pursuant to Title II of the Social Security Act (the "SSA"), 42 U.S.C. §§ 401-433.  Jurisdiction is proper under 42 U.S.C. § 405(g).  Oral arguments will not materially aid in resolving this appeal.  After considering the briefs and the administrative record, I REVERSE the Commissioner's final order and REMAND for further proceedings consistent with this order and judgment.

**I.  STATEMENT OF THE CASE**

Plaintiff seeks judicial review of the Commissioner's decision denying his July 13, 2007, application for disability insurance benefits. [Administrative Record ("AR") 61]  The application was initially denied at the administrative level. [AR 61]  An Administrative Law Judge ("ALJ") subsequently conducted a hearing on August 4, 2009, and issued a written ruling on September 18, 2009, denying Plaintiff's application on the basis that he was not disabled between the date on which he alleges that he became disabled and the date the ALJ rendered his decision. [AR 8-27]   On

January 8, 2011, the Social Security Administration Appeals Council (the "Appeals Council") denied Plaintiff's administrative request for reconsideration, making the denial final for the purpose of judicial review. [AR 1]  Plaintiff timely filed his complaint with this Court seeking review of the Commissioner's final decision.

## II.  FACTS

Plaintiff was born on October 19, 1966, and was 38 years old on his alleged onset date and was 44 years old when last insured. He graduated from high school and subsequently attended commercial truck driving school in Denver where he obtained a class "A" commercial license and fork lift certification. [AR 201]  His prior work history consists of commercial truck driving and managing a convenience store. [AR 201].  Plaintiff alleges that he became disabled on March 24, 2005, due to an accident. (Plaintiff originally alleged an onset date of September 30, 2006, but later amended it to the March date.) Pursuant to 20 C.F.R. § 404.130, in order to be eligible for benefits, Plaintiff must prove that his disability began before the date through which he remained insured, which was June 30, 2010. [AR 11]  The relevant time period for determining disability is therefore March 24, 2005, through June 30, 2010. [AR 11]

On March 24, 2005, Plaintiff fractured his left femur while attempting to climb into his work truck. He was taken by ambulance to McKee Medical Center.  The fracture was surgically repaired by Dr. Eric Young. [AR 297, 434]  In Plaintiff's follow-up visits with Dr. Young between the surgery and May 2005, Dr. Young repeatedly stated that Plaintiff was "doing reasonably well," "better," and "quite well." [AR 297-99].  Dr. Young noted, however that Plaintiff was experiencing knee and back pain. [AR 297-99]

In May 2005, Plaintiff began treatment at Workwell Occupational Medicine ("Workwell"). [AR 311-52] His treatment there would run through July 2007. At Workwell, Plaintiff was treated by multiple doctors, including Dr. Robert Nystrom. Plaintiff's treatment consisted mostly of medication and physical therapy. [*See* AR 311-52]

Three months after Plaintiff's accident and surgery, in June 2005, Dr. Young recommended that Plaintiff continue physical therapy and that he wean from crutches. [AR 434] Then, in July 2005, pursuant to a prescription by Dr. Young, Plaintiff began using a cane. [AR 434]

In late November 2005, Plaintiff was still experiencing pain. [AR 367] As a result, Dr. Nystrom recommended that Plaintiff continue physical therapy and referred him to Dr. John Bender, a physiatrist. [AR 344] Dr. Bender examined Plaintiff on December 7. [AR 435] He noted that Plaintiff walked with a marked antalgic gait, had significant left knee patellofemoral crepitation, and pain inhibition of hip motion. [AR 435] Dr. Bender recommended further medical tests. [AR 435]

On January 6, 2006, Plaintiff underwent an MRI of his left leg. [AR 409] It revealed a nonunion of Plaintiff's femoral fracture. [AR 409] To aid union, Dr. Young removed the distal interlocking screws from Plaintiff's leg in February 2006. [AR 306]

In February 2006, Plaintiff saw Dr. Nystrom. From that session, Dr. Nystrom opined that Plaintiff could lift 25 pounds and could sit, stand, and squat for up to 30 minutes at a time. [AR 343]

Plaintiff saw Dr. Young again in April and June 2006. At the April visit, Plaintiff reported that he still had "significant thigh pain." [AR 309] Dr. Young noted that Plaintiff's fracture "appears to be healing" and that Plaintiff will "continue with work restrictions, including no climbing, limited standing, no squatting, and limited lifting, pushing a pulling." [AR 309] At the June visit, Dr. Young noted that Plaintiff was "still having a fair amount of pain" in the left femur,

knee, and low back. [AR 309]  Dr. Young examined Plaintiff and found that he was still walking with a "very antalgic gait" and that the range of motion in his lumbar spine was "somewhat reduced." [AR 309] An x-ray of Plaintiff's left leg revealed "solid union of the [femoral] fracture." [AR 309] An x-ray of the lower spine showed spondylothesis at L5-S1and degenerative changes at L3-4 and L4-5. [AR 309] Dr. Young then referred Plaintiff to Dr. Jeffrey Donner, a spine surgeon.

Plaintiff underwent another MRI on July 27, 2006. It revealed a broad-based protrusion at L5-S1 with moderate right foraminal encroachment and a central protrusion at L4-5 indenting the thecal sac. [AR 411] Dr. Donner reviewed the MRI and then performed an epidural steroid injection and facet joint injection in August 2006. [AR 411-15] The injections were ineffective.  [AR 413]

In January 2007, Plaintiff was still having persistent left leg and lower back pain. [AR 355] He saw Dr. Nystrom at the end of that month.  Dr. Nystrom opined that as a result of the March 2005 accident, Plaintiff had a 32 percent impairment of his lower left leg. [AR 355]

Next, on March 14, 2007, and in connection with his worker's compensation claim, Plaintiff saw Dr. John Hughes for an independent medical examination. [AR 434-46] Dr. Hughes reviewed Plaintiff's medical history and records and conducted his own exam. [AR 434-46]  He observed Plaintiff's inability to tolerate the supine position and corresponding inability to measure hip range of motion, right lumbar tenderness, visible lower leg edema, leg length discrepancy with left greater than right, left and right knee patellofemoral crepitation, and left hip arthrosis with range of motion deficits.  From this, he opined that Plaintiff's whole person was 33 percent impaired.  [AR 441].  He nevertheless concluded that Plaintiff could perform sedentary work with sitting and standing mixed as tolerated and that Plaintiff should limit his lifting and carrying to ten pounds. [AR 441]

On June 27, 2007, again in connection with his worker's compensation claim, Plaintiff visited Dr. Joseph Fillmore for an independent medical examination. [TR 447] Dr. Fillmore's notes closely mirror Dr. Hughes'. They show that the exam revealed antalgic gait with leg length discrepancy; unbalanced heel-to-toe walk; and pain with flexion, extension, and side-bending at the waist. [AR 449] Dr. Fillmore also noted bilateral bipedal edema and that Plaintiff was in pain with most movements. [AR 449-50] He assigned Plaintiff with a 29 percent impairment to his whole person. [AR 453] Dr. Fillmore opined that Plaintiff could perform sedentary work with maximum lifting of ten pounds and alternating sitting and standing as needed. [AR 452]

Plaintiff then visited Dr. Nystrom on July 3, 2007, complaining chiefly of back pain. [AR 311] In the "physical exam" section of Dr. Nystrom's notes from that day, he wrote that Plaintiff was "[i]n obvious discomfort, ambulating with a cane very slowly. Diffuse tenderness to palpitation on the lumbosacral area." [AR 311] Dr. Nystrom told Plaintiff to continue with his current prescription medication regimen and wrote him a prescription for Percocet. [AR 311] Dr. Nystrom told Plaintiff that, if his pain did not subside in the next several weeks, he should return for a follow-up. [AR 311]

In September 2007, at Defendant's request, Plaintiff underwent a physical examination by Dr. Dale Mabe. [AR 455-59] That examination yielded the following: Plaintiff appeared to be in some discomfort secondary to pain with ambulating and getting up from a seated position. [AR 458] He had pedal edema, walked with an antalgic limp necessitating an assistive device, and had difficulty walking heel-to-toe. [AR 459] Additionally, Plaintiff had normal muscle strength in his upper and lower extremities–that is, a "5/5"–with the exception of resisting flexion and extension

5

of his left knee, which tested at a 4/5. [AR 458] Plaintiff reported to Dr. Mabe that he could lift 25 pounds, drive for about an hour, and sit, stand, or walk for 20 minutes at a time. [AR 459]

Later that month, Dr. M. Susman, a state agency medical examiner, reviewed Plaintiff's records and completed a "Physical Residual Functional Capacity Assessment" form. [AR 240-47] Dr. Susman concluded that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, that he could sit approximately six hours in an eight-hour workday, and would be required to periodically vacillate between sitting and standing. [AR 241]

Approximately seven months later, in April 2008, Plaintiff underwent another MRI. It revealed numerous spinal issues. [AR 462-64] Then, in June 2008, Plaintiff had further femur and knee imaging. [AR 475] This imaging showed left knee and left hip osteoarthritis. [AR 475]

Plaintiff then visited Dr. Margaret Irish, a workers' compensation physician, on June 17, 2008, for a one-time evaluation. [AR 491] From her examination, she opined that Plaintiff could not work more than four hours per day. [AR 491]

In December 2008, Plaintiff returned to see Dr. Nystrom.  By that time, Dr. Nystrom had left Workwell's and was practicing family medicine elsewhere. [AR 481] His notes from that visit do not reflect any physical assessment of Plaintiff. [*See* AR 481] From this time forward, Dr. Nystrom began treating Plaintiff as a regular patient outside the worker's compensation system. [AR 514]

Plaintiff next saw Dr. Nystrom on July 6, 2009. That day, Dr. Nystrom completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" (the "MSS"). [AR 492-97] In it, Dr. Nystrom opined that Plaintiff could occasionally lift ten pounds; could sit, stand, and walk for 15 to 30 minutes at a time; could sit for three hours in an eight-hour day; could never reach, push, or pull; and could not stoop, kneel, crouch, or crawl. [AR 492-95]  Dr. Nystrom also

commented that Plaintiff is on "strong narcotic pain medications . . . that decrease his alertness and ability of focus on tasks." [AR 499] In a supplemental narrative he wrote three days later, Dr. Nystrom opined that Plaintiff "cannot function at an acceptable level in any work environment." [AR 499]

### III.  LAW

A five-step sequential evaluation process is used to determine whether a claimant is disabled under the SSA, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 137 (1987).

Step One is whether the claimant is presently engaged in substantial gainful activity. If he is, disability benefits are denied. *See* 20 C.F.R. § 404.1520. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 404.1520(c). If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. Step Three then assesses whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. § 404.1520(d). If the impairment is not listed, he is not presumed to be conclusively disabled. Step Four then requires the claimant to show that his impairment(s) and assessed residual functional capacity ("RFC") prevent him from performing work that he has performed in the past. If the claimant is able to perform his previous work, the claimant is not disabled. *See id.* §§ 404.1520(e),

(f).  Finally, if the claimant establishes a *prima facie* case of disability based on the four steps discussed, the analysis proceeds to Step Five where the Commissioner has the burden of proving that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience.  *See id.* § 404.1520(g).

As relevant here, a claimant is required to establish that he became disabled prior to the expiration of his insured status.  *Id.* § 404.130; *see also Potter v. Sec'y of Health & Human Servs.,* 905 F.2d 1346, 1347-48 (10th Cir. 1990).

## IV. ALJ's RULING

The ALJ found that Plaintiff met the insured status requirements of the SSA through June 30, 2010. [AR 13]  He ruled that Plaintiff had not engaged in substantial gainful activity since his amended alleged onset date (Step One). [AR 13]  The ALJ also found that through the hearing date Plaintiff had the following severe medical impairments: status-post femur fracture with subsequent hardware removal, left knee arthrosis, and degenerative lumbar disc disease (Step Two). [AR 14]  Because the ALJ determined that he did not have an impairment or combination of impairments that meets or medically equals a listed impairment (Step Three), the ALJ went on to assess Plaintiff's RFC. [AR 14]

The ALJ evaluated all of the evidence and found that as of the hearing date, Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a). [AR 15]  Specifically, the ALJ concluded that Plaintiff has the following RFC.  With the use of a single-point cane, Plaintiff can lift and carry less than ten pounds frequently and can do ten pounds occasionally. [AR 15]  He can push and pull less than ten pounds frequently and can do ten pounds occasionally. [AR 15]  In an eight-hour day, he can stand or walk at least four hours and, provided that he can alternate

positions every 30-45 minutes, he can sit at least four hours. [AR 15]  He can also climb ramps and

stairs frequently and balance frequently. [AR 15]  However, he can never climb ladders and ropes.

[AR 15]  He can occasionally stoop, kneel, crouch, and crawl.  [AR 15] He should not have

concentrated exposure to wetness or humidity, nor to extreme heat or cold.  [AR 15-16] Finally,

Plaintiff should not be exposed to hazards in the workplace. [AR 16]

As a result of Plaintiff's RFC assessment, the ALJ found that he was unable to perform any

of his past relevant work (Step 4).  [AR 20] The ALJ therefore proceeded to the fifth and final step.

The ALJ found that significant jobs existed in the national economy for Plaintiff given his

age, education, work experience, and RFC. [AR 20] These jobs included telephone information clerk

and call out operator. [AR 21]  Thus, the ALJ denied Plaintiff's application because he was not

under a disability as defined by the SSA–from his alleged disability onset date through the date of

the hearing–at Step 5 of the sequential evaluation process. [AR 20-21]  On review, the Appeals

Council "found no reason" to reconsider the ALJ's decision. [AR 1]

## V.  STANDARD OF REVIEW

My review here is limited to whether the final decision is "supported by substantial

evidence" in the record as a whole and whether the correct legal standards were applied.  *Williamson*

*v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir.

2001); *Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir. 2000).  My review of the factual findings is

to determine whether they "are based upon substantial evidence and inferences reasonably drawn

therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be

disturbed."  *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970). "Substantial evidence"

is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005).  "It requires more than a scintilla, but less than a preponderance."  *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004).

## VI. APPEAL

Plaintiff raises seven issues on appeal. Because the first and third issues are closely related, I begin with those two and address them together.

### A. Dr. Nystrom's Opinions

Plaintiff's first and third issues on appeal concern two opinions by Dr. Nystrom. The first is Dr. Nystrom's collective opinions in the MSS.  The second opinion is in the narrative Dr. Nystrom wrote to supplement the MSS. With respect to those opinions, the ALJ stated the following:

> Dr. Robert Nystrom . . . treated the claimant from March 2005 to July 2007.  He opined on January 31, 2007 that the claimant should not be required to lift more than twenty-five pounds, nor required to stand or squat for more than forty-five minutes at one time. Dr. Nystrom also stated that the claimant should not be required to do kneeling, stooping, or crawling, but did not describe any other restrictions. The claimant did not see Dr. Nystrom again until December 2008, for a refill of his medications. There is no other visit to Dr. Nystrom until July 6, 2009, when Dr. Nystrom completed a Medical Assessment of Physical Ability to do Work-Related Activities (MSS).  Dr Nystrom stated in this report that the claimant can never reach, push, or pull with either hand, never balance, stoop, kneel, crouch or crawl. This is inconsistent, however, with the doctor's statements in the same MSS that the claimant can shop and travel without assistance, climb stairs with a single handrail, prepare simple meals, care for his own hygiene, and handle, sort and use papers and files. This opinion is also inconsistent with the substantially greater abilities Dr. Nystrom attributed to the claimant during his previous treatment history. *Given the gap in contact with the claimant, and the absence of medical findings in the MSS to support the restrictions he outlined, this opinion is given little weight.  In addition, Dr. Nystrom's statement in his narrative that the claimant cannot function in any work environment is given no weight.* Under the Social Security regulations, statement by treating physicians that a claimant is disabled or unable to work are not medical opinions, and as opinions on issues reserved to the Commissioner, are not given any special significance.

[AR 18 (citations omitted) (emphases added)]

### 1. The MSS Opinion

Plaintiff argues on appeal that the ALJ erred in according Dr. Nystrom's MSS opinion "little weight." He argues this conclusion is erroneous on multiple grounds. Broadly, Dr. Nystrom was a treating source; therefore his MSS opinion was entitled to controlling weight. Plaintiff also challenges the various reasons the ALJ proffered for according the opinion little weight.

Defendant's counter is that the ALJ properly applied the framework delineated below. Thus, according to Defendant, the ALJ did not err in according Dr. Nystrom's MSS opinion the weight he did. For the reasons below, I agree with Defendant.

The parties postulate that Dr. Nystrom was a treating physician. Under governing law "an ALJ must 'give good reasons in [the] notice of determination or decision' for the weight assigned to a treating physician's opinion." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (citing 20 C.F.R. § 404.1527(d)); *see also* Social Security Regulation ("SSR") 96-2p, 1996 WL 374188, at *5. Additionally, the decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Watkins*, 350 F.3d at 1300 (citing SSR 96-2p).

There is a guiding framework that an ALJ should follow when dealing with treating source medical opinions related to the nature or severity of a claimant's impairments. *See id.* To begin, an ALJ should generally give more weight to medical opinions from treating sources than to those from non-treating sources. *Id.*; *accord Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004), *and Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987). When deciding how much weight to accord a treating source opinion, "an ALJ must first determine whether the opinion qualifies for 'controlling weight.'" *Watkins*, 350 F.3d at 1300. "It is an error to give an opinion controlling weight simply

11

because it is the opinion of a treating source." *Id.* (citing SSR 96-2p).  Instead, to determine whether the opinion merits controlling weight, the ALJ must engage in a two-step analysis.  The ALJ must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.  *Id.* If it is not, this particular inquiry ends. *Id.*   If, however, the ALJ finds that the opinion is well-supported, he must confirm that the opinion is consistent with other substantial evidence in the record.  "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." *Id.*

Determining that the opinion is not entitled to "controlling weight" does not end the ALJ's analysis, as he must still decide what weight to accord the opinion, if any. A treating source opinion not entitled to controlling weight is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." *Id.* (quoting SSR 96-2p). Those factors include the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; the degree to which the physician's opinion is supported by relevant evidence; and the consistency between the opinion and the record as a whole. *Id.* at 1301; *accord* 20 C.F.R. § 404.1527(d); SSR 06-03p, 2006 WL 2329939, at *5.  The ALJ is not required to "apply expressly" all the relevant factors when determining the weight of a medical opinion.  *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).  Nor does the ALJ need to formulaically articulate a detailed analysis of each factor.  *See Qualls*, 206 F.3d at 1372; *see also Branum v. Barnhart*, 385 F.3d 1269, 1275-76 (10th Cir. 2004). Indeed, the Commissioner has recognized that "not every factor for weighing opinion evidence will apply in every case."   *Oldham,* 509 F.3d at 1258.

12

After considering the pertinent factors, the ALJ must proffer "good reasons" in the decision for the weight he ultimately assigned the treating opinion.  *Watkins*, 350 F.3d at 1301 (quoting § 404.1527(d)(2)).  To reject the opinion entirely, he must give "specific, legitimate reasons."  *Id.*; *accord Miller v. Chater*, 99 F.972, 976 (10th Cir. 1996) (quoting *Frey*, 816 F.2d at 513).

I find that the ALJ's decision to accord the Dr. Nystrom's MSS opinion "little weight" comports with the principles above.  He explicitly cited four reasons for this conclusion.  He found that they were internally inconsistent–that is, that the opinions therein were discordant.  He likewise found that the opinions in the MSS were externally inconsistent–to wit, they were also incongruous with Dr. Nystrom's previous opinions. [AR 18]

Assessing an opinion's consistency is required when deciding whether an opinion is entitled to controlling weight.  *See Watkins*, 350 F.3d at 1300.  Consistency is also a relevant consideration when deciding what weigh, to accord an opinion.  *See id.* at 1301; s*ee also White*, 287 F.3d at 907-08 ("[W]e agree with the district court that he set forth specific and legitimate reasons for discounting the doctor's opinion. He noted first the discrepancy between Dr. Fanning's very restrictive functional assessment and her contemporaneous examination of Ms. White, which revealed that Ms. White possessed fair physical strength in various muscle groupings. The ALJ also contrasted the detailed nature of examinations performed by at least one of the consulting doctors with that of Dr. Fanning."); 20 C.F.R. § 404.1527(d); SSR 06-03p, 2006 WL 2329939, at *5.  And an ALJ may discount or reject a treating physician's opinion where the physician's subsequent report does not explain a claimant's decreased RFC and there is not an apparent change in the claimant's medical condition.  *See White*, *supra* ("Still more troubling for the ALJ was that Dr. Fanning did not explain the differences between her 1996 and 1997 assessments of Ms. White.  In

1996, according to Dr. Fanning, Ms. White was capable of lifting five to ten pounds; by 1997 she could lift only five pounds."); *see also Hackett*, 395 F.3d at 1174 (concluding that a physician's opinion may be rejected if it is unsupported by the physician's own records).  These two reasons for discounting the MSS opinion are thus good, specific, and legitimate. The ALJ also cited evidence of record in support of both. [*See* AR 18]

Relatedly, the ALJ also explained that he discounted the MSS opinion because it lacked undergirding medical findings. [AR 18]  An opinion cannot be given controlling weight if it lacks such support.  *Watkins*, 350 F.3d at 1300.  The opinion may likewise be discounted or rejected if there is a discrepancy between an RFC and contemporaneous examination findings or if the opinion is conclusory and unsupported by medical evidence.  *See White*, *supra*; *Hackett*, *supra*; *see also Frey*, 816 F.2d at 513, *and* 20 C.F.R. § 404.1527(d).  Similarly, the treatment provided and the kind of examination or testing performed are appropriate factors to consider when weighing a physician's opinion.  *Watkins*, 350 F.3d at 1301; 20 C.F.R. § 404.1527(d); SSR 06-03p.  Hence, these are good and specific and legitimate reasons to discount the MSS opinion.

Dr. Nystrom's contemporaneous records do not reflect that the MSS opinion was the product of a medical examination.  [*See* AR 353-71, 481] Put differently, there is no indication in the record that the MSS opinion was the result of contemporaneous medically acceptable tests or exams.  *See, e.g.*, *White*, 287 F.3d at 907-08 (affirming ALJ's decision to reject treating physician's opinion in part because "[t]here is no indication in the record that this assessment was accompanied by a medical examination").  (I note parenthetically that Plaintiff all but concedes this point in his reply. *See* Pl.'s Reply at 2-3 ("Dr. Nystrom's opinions should not be discounted because he did not formally test Plaintiff's ability to sit, stand, etcetera . . . . .").)  Indeed, under each category of

findings in the MSS report–for example, under the "Lifting/Carrying" section–there is a directive to "[i]dentify the particular medical or clinical findings (i.e. physical exam findings, x-ray findings, laboratory test results, history, and symptoms including pain, etc.) which support your assessment or any limitations and why the findings support the assessment." [*See* AR 492-96].  None of these directives was followed.  Consequently, the MSS opinion is devoid of supporting explanation. [*See* AR 492-96]  This is problematic.  *See White*, 287 F.3d at 907-08 (affirming ALJ's decision to reject a treating physician's opinions in part because the physician did not explain what medical findings supported the opinions).  Looking longitudinally at Dr. Nystrom's past records pertaining to the Plaintiff also fails to support his MSS opinion.  First, Dr. Nystrom's most recently examined Plaintiff two years before the MSS. [*See* AR 311]  Second, Dr. Nystrom's past records do not contain restrictions as severe as those in the MSS. [*See* AR 353-71, 481]

The ALJ also stated that he was concerned with the gap in Dr. Nystrom's treatment of Plaintiff. [AR 18] (I note parenthetically that the ALJ incorrectly stated that Dr. Nystrom did not see Plaintiff between January 2007 December 2008. [AR 17-18] Dr. Nystrom did see Plaintiff in July 2007. [AR 311] This misstatement, however, is not reversible error because I conclude *infra* that, even accounting for the July 2007 visit, substantial evidence still supports the ALJ's decision to discount the MSS opinion partially because of a gap in treatment history.)  This is a valid consideration when determining the weight to accord a treating physician's opinion.  *See Watkins*, 350 F.3d at 1301; 20 C.F.R. § 404.1527(d); SSR 06-03p.  The record shows that from August 2005 through July 2007, Dr. Nystrom saw Plaintiff 14 times.  But between July 2007 and the MSS in July 2009, Dr. Nystrom saw Plaintiff only once, in December 2008.  At that December visit, no exam was performed; Dr. Nystrom just refilled Plaintiff's pain medication prescription.  That means that in the

15

two years prior to the MSS opinion–which, as explained, lacks supporting medical findings–Dr. Nystrom had not examined Plaintiff and had seen him just once.  To be clear, this review focuses exclusively on the weight accorded the MSS opinion–not on Dr. Nystrom or on one of his opinions during the two-year period from 2005 to 2007 during which he saw Plaintiff 14 times.

As stated, the ALJ specified four good, legitimate reasons for discounting Dr. Nystrom's MSS opinion.  Recall that the ALJ need not "apply expressly" all the relevant factors when determining the weight of a medical opinion. *See Oldham*, 509 F.3d at 1258-5.  Nor must he formulaically articulate a detailed analysis of each factor. *See Qualls*, 206 F.3d at 1372.  The ALJ's decision was "sufficiently specific to make clear to any subsequent reviewers the weight [he] gave to the treating source's medical opinion and the reasons for that weight." *Watkins*, 350 F.3d at 1300 (citing SSR 96-2p).  That was what was required.

My inquiry, then, turns to whether this decision is supported by substantial evidence.  In so doing, I assess whether there is "more than a scintilla" of supporting evidence. *See Zoltanski*, 372 F.3d at 1200.  Importantly, I do not reweigh the evidence or substitute my judgment for the Commissioner's. *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1498, 1500 (10th Cir. 1992) (citation omitted).  And, again, an ALJ's decision must be affirmed if it is supported by that quantum of evidence, even if I would have reached a divergent conclusion had I been reviewing the matter de novo. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different

choice had the matter been before it de novo.") (internal citations and quotations omitted)). I find that the evidence presented above, in its totality, is of such a quantity.

Accordingly, the decision to accord Dr. Nystrom's MSS opinion "little weight" was not erroneous.

### 2. The Narrative Opinion

Plaintiff also appeals how the ALJ treated Dr. Nystrom's opinion in the narrative he wrote to supplement the MSS. In the narrative, Dr. Nystrom opined that Plaintiff "cannot function at an acceptable level in any work environment." [AR 499] The ALJ gave this opinion "no weight;" Plaintiff claims that this was an error.  I disagree.

Applicable law distinguishes between a treating physician's medical and non medical opinions.  The framework in Part VI.A.1., *supra*, applies only when the opinion is a "medical" one. *See, e.g.*, *Watkins*, 350 F.3d at 1300. (stating that an ALJ should "generally give more weight to *medical* opinions from treating sources than those from non-treating sources") (emphasis added); *see also* 20 C.F.R. § 404.1527(b) ("How we consider *medical* opinions. In deciding whether you are disabled, we will always consider the *medical* opinions in your case record together with the rest of the relevant evidence we receive.) (emphases added), § 404.1527(d) ("How we weigh *medical* opinions. Regardless of its source, we will evaluate every *medical* opinion we receive.") (emphases added). Certain opinions are not "medical opinions." For example, statements that a claimant is "unable to work" or "is disabled" are not medical opinions. *Id.* § 404.1527(e)(1).  Non-medical opinions are reserved to the Commissioner exclusively.  *See* 20 C.F.R. § 404.1527(e).  They are not given any special significance.  *Id.* § 404.1527(e)(3).  That notwithstanding, an ALJ cannot ignore

the non-medical opinion.  *See* SSR 96-5p.  He must instead "evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." *Id.*

As an initial matter, contrary to Plaintiff's assertion, the ALJ did not ignore the narrative opinion; he addressed it expressly. [*See* AR 18] Furthermore, as explained above, the ALJ was correct in asserting that the narrative opinion did not merit any special significance.  Plaintiff's position appears to be that the "In addition" at the beginning of the sentence somehow partitions the paragraph.  Under his position, this partition disembodies the ALJ's conclusion regarding the narrative opinion from the preceding analysis, thus leaving the conclusion floating unsupported.

I read the paragraph differently.  My reading is that the ALJ's conclusion giving the narrative opinion no weight flowed from the preceding analysis–the external and internal inconsistencies, the temporal gap in treatment, and the absent medical bases for the MSS–just as his conclusion to give the MSS opinion "little weight" did.  I read  the "Under the Social Security regulations" sentence to simply highlight the legal distinction between the MSS and narrative opinions.  The fact that Dr. Nystrom authored the narrative opinion just three days after the MSS opinion and did so explicitly as a supplement to thereto buttresses my reading. Put differently, my reading of the ALJ's decision is the following: The ALJ discerned and noted the important distinction between the two opinions, and, after evaluating the evidence of record, for the reasons he articulated, he discounted the MSS opinion *and* rejected the narrative opinion. He simply addressed the MSS opinion first. And because I found his reasons to be specific, good, and legitimate, and supported by substantial evidence, it follows that the ALJ did not err in rejecting the narrative opinion.

Accordingly, the decision to accord Dr. Nystrom's narrative opinion no weight was not erroneous.

### B. Dr. Susman's Opinion

Plaintiff next argues that the ALJ erred by giving Dr. Susman's opinion "great weight." Dr. Susman was the medical consultant for the State Agency Disability Determination Services.  In SSA nomenclature, this doctor was thus a reviewing or non-examining source. The ALJ "assign[ed] great weight." [AR 17] I agree with Plaintiff that this was erroneous.

An ALJ cannot ignore a nonexamining source's opinion; he must evaluate and consider it. *See* 20 C.F.R. § 404.1527(d) ("Regardless of its source, we will evaluate every medical opinion we receive.").  The general rule is that a nonexamining physician's opinion is given less weight than a treating physician's opinion.  *See id*; *see also Martinez v. Astrue*, 422 Fed. App'x 719, 724 (10th Cir. 2011) ("Opinions from examining psychologists are generally entitled to less weight than those of a treating source, and the opinions of nonexamining psychologists who have never seen the claimant are generally entitled to the least weight of all."); *Talbot v. Heckler*, 814 F.2d 1456, 1463 (10th Cir.1987) ("The reports of *reviewing* physicians are also accorded less weight than those of *examining* physicians.").

An ALJ must evaluate the nonexamining opinion using the same factors used to evaluate an examining opinion. *See* 20 C.F.R. §§ 404.1527(d), (f)(2)(ii).  These are the examining relationship; treatment relationship, which means length, frequency, nature, and extent; supportability; consistency; specialization; and other factors such as the source's amount of understanding of the disability program. *Id.* §§ 404.1527(d), (f)(2)(ii).  Then, unless a treating source's opinion is given controlling weight, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant." *Id.* § 404.1527(f)(2)(ii).

I start from the presumption that, as a nonexamining source, Dr. Susman's opinions should receive less weight than treating and examining sources' opinions.   Yet the ALJ gave no opinion more weight than Dr. Susman's. [*See* AR 17-20] He stated that Dr. Susman's opinion merited such weight because Dr. Susman "is a physician, with extensive knowledge of the disability program, who reviewed all the available surgical and treatment records up to that point." [AR 17]

That Dr. Susman is a physician is not a factor to consider when evaluating the opinion.  *See* 20 C.F.R. §§ 404.1527(f), (d).  Defendant does not direct me to law stating that, in this context, being a "physician" constitutes a "specialization" for purposes of the factorial analysis. *See id.* § 404.1527(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Moreover, this fact does not distinguish Dr. Susman; nearly all other treating sources are also physicians, including those whose opinions were accorded lesser weight.   [*See, e.g.*, AR 18-19 (according Drs. Young and Hughes' opinions "some weight" and Drs. Nystrom's and Irish's "little weight")] It is therefore opaque how this fact supports giving Dr. Susman's opinion the most weight.

Turning to the second part of his explanation, Dr. Susman's knowledge of the disability program is indeed a valid consideration in determining the opinion's weight.   *See id.* §§ 404.1527(d),(f)(2)(ii).   But no evidence of record supports that   Dr. Susman verily has such knowledge. Certainly, then, this conclusory assertion is not supported by substantial evidence. *See Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Furthermore, assuming, *arguendo*, that such evidence exists, it alone would not overwhelm the general rule that Dr. Susman's opinion should have been accorded the least amount of weight vis-à-vis the other medical opinions.

Under applicable law, the final reason for the ALJ's decision–that Dr. Susman's opinion derived solely from a review of all the available surgical and treatment records up through the date of the opinion–supports giving Dr. Susman's opinion *less* weight than the examining physicians' opinions, not more. *See* 20 C.F.R. § 404.1527(d); *Martinez*, 422 Fed. App'x at 724; *and Talbot*, 814 F.2d at 1463. I also note that copious exhibits were entered into the record after Dr. Susman's review, which included reports from treating physicians, MRIs, functional capacity assessments, and vocational assessments. [*See*, *e.g,.*, 460-523]

Dr. Susman's opinion may have garnered more weight because Dr. Nystrom's opinions were discounted. *See* Part VI.A. The ALJ, however, must still must evaluate Dr. Susman's opinion using the factors prescribed in § 404.1527(d) to explain why he accorded the opinion "great weight," and that explanation must be supported by substantial evidence. Yet he does not cite any factors in support of his determination concerning the opinion other than those discussed. And those were found to be insufficient. It is true that the ALJ need not apply all the factors in § 404.1527(d) expressly or formulaically. *See Oldham*, 509 F.3d at 1258-59; *Qualls*, 206 F.3d at 1371; *Branum*, 385 F.3d at 1275-76. But given the strong presumption that Dr. Susman's opinion should receive the *lightest* weight of all, and that the proffered explanations were tenuous, the absence of a discussion of other relevant § 404.1527(d) factors leaves his appraisal lacking.

Perhaps under other § 404.1527(d) factors, Dr. Susman's opinion indeed merits some weight. Here and now though, I "may not create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision itself." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). It is not apparent from the ALJ's decision that he granted Dr. Susman's opinion the weight he did for any reason other than those he

discussed.  Whether that weight is explained and supported by substantial evidence is therefore confined to those stated reasons.

Accordingly, I reverse the Commissioner's final order with respect to the weight accorded to Dr. Susman's opinion and remand the matter to the Commissioner so the ALJ can reappraise the opinion in accordance with this order, the record, and the factors in § 404.1527(d).  This could cause the ALJ to reconstruct his RFC, which might necessitate reweighing the other medical opinions, including those discussed in this order and judgment.  As a corollary, the ALJ may render a new disability determination on remand.  The Court countenances new findings and determinations as a consequence of reappraising Dr. Susman' s opinion so long as they are supported by substantial evidence and the correct legal standards are applied.

### C. Plaintiff's Credibility Determination

Plaintiff's fourth claim of error is that substantial evidence does not support the ALJ's determination that his testimony was not credible.  Although I disagree that the ALJ erred in this respect, the ALJ may reevaluate Plaintiff's credibility as to the RFC in light of reappraising Dr. Susman's opinion as ordered in Part VI.B., *supra*.

Once a claimant has established a medically determinable impairment that could reasonably be expected to cause his symptoms, including pain, an ALJ is to "consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings and statements about how [the claimant's] symptoms affect [him]."  20 C.F.R. § 404.1529(a).  This includes evaluating the intensity, persistence, and limiting effects of those symptoms.  *Id.* § 404.1529(c)(1).  To the extent symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding about the credibility of the claimant's statements about his

symptoms and their functional effects based on consideration of the entire record.  *See* SSR 96-7p;

*accord* 20 C.F.R. § 404.1529(a) ("We will then determine the extent to which your alleged

functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as

consistent with the medical signs and laboratory findings and other evidence to decide how your

symptoms affect your ability to work.").  "Credibility determinations are peculiarly the province of

the finder of fact," and I "will not upset such determinations when supported by substantial

evidence." *McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir. 2002) (quoting *Kepler v. Chater*,

68 F.3d 387, 391 (10th Cir. 1995)). Indeed, an ALJ's credibility determination is generally treated

as binding upon review. *Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988) (citing *Broadbent v.*

*Harris*, 698 F.2d 407, 413 (10th Cir. 1983)).

      In his decision, the ALJ found that Plaintiff's medically determinable impairments could

reasonably be expected to cause the alleged symptoms. [AR 17]  He concluded, however, that

"[a]fter careful consideration of the evidence . . . the claimant's statement concerning the intensity,

persistence, and limiting effects of these symptoms are not fully persuasive to the extent they are

inconsistent with the claimant's own report and the [RFC] described in this decision." [AR 17] To

make this determination, the ALJ "careful[ly] consider[ed] the entire record," including all medical

evidence and opinion evidence. [AR 15, 16] In support of his credibility finding, the ALJ

summarized the Plaintiff's testimony and found inconsistencies therein. [AR 16-17]  He also found

that Plaintiff's testimony was inconsistent with the RFC. [AR 17, 16-20]

      Plaintiff argues that his testimony was not internally inconsistent.  In discussing Plaintiff's

self-reported activities, the ALJ stated that Plaintiff "admitted at the hearing that he occasionally

mows the grass with a 'hydrostatic clutch push mower.' "  Plaintiff says that this was a

"misrepresentation" because, at the hearing, Plaintiff testified that he mows the edges of his law, that his neighbor mows the rest, and that his mower moves at a walking pace. [AR 38] Additionally, Plaintiff asserts that some of the statements that the ALJ found to be inconsistent with his reported RFC are not inconsistent with read in context. He argues that this is because the activities that he testified he can do "represent a small portion of the day and are not representative of what he believes he can do on a full time bases in a competitive work environment." Pl.'s Mot. at 21. In sum, Plaintiff asserts that the ALJ simply "cherry-picked" certain pieces of the record to support his credibility determination.

Generally, I "take a lower tribunal at its word when it declares that it considered a matter." *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (quoting *Hackett*, 395 F.3d at 1173). In at least two different places in his decision, the ALJ stated that he had considered the entire record. His lengthy discussion of the evidence, plaintiff's testimony, and the reasons for his conclusions give me no reason to depart from the general practice. I thus reject the notion that the ALJ formed his determination from certain "cherry-picked" statements.

Secondly, the ALJ, as he must, proffered specific reasons for discounting Plaintiff's credibility. The ALJ pointed to inconsistencies within Plaintiff's testimony regarding his activities and abilities. [AR 16] This is a proper consideration for determining credibility. *See White*, 287 F.3d at 909; *Musgrave*, 966 F.2d at 137; *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). He also stated that some of Plaintiff's purported symptoms were discordant with medical evidence. This, too, is a proper consideration. *See e.g.*, *White*, 287 F.3d at 909. The query thus becomes whether these reasons are supported by substantial evidence.

Recall that substantial evidence is not a preponderance. *Zoltanski*, 372 F.3d at 1200. And whether I would have reached a divergent conclusion had I been reviewing the matter de novo is not the inquiry. *See Lax*, 489 F.3d at 1084. I am simply looking for more than a scintilla of evidence supporting the determination.   My review of the record and the ALJ's decision leads me to conclude that quantum of evidence exists.   Plaintiff is essentially asking me to reweigh the evidence.   This I cannot do.   *See Hamilton*, 961 F.2d at1498, 1500.

Consequently, I conclude that the ALJ did not err with respect to this determination.

### D. New Evidence Presented to the Appeals Council

Plaintiff's fifth issue is that the Appeals Council erred by failing to appropriately weigh new material evidence he submitted to it after the hearing.   I disagree.

On February 3, 2010, Plaintiff submitted a letter to the Appeals Council that included, among other things, a narrative dated January 21, 2010, from Dr. Nystrom. [AR 502, 514-15] In its response denying Plaintiff's request for review, the Appeals Council stated that "[i]n looking at your case, we considered the reasons you disagreed with the decision *and the additional evidence listed on the enclosed Order of Appeals Council*. We found that this information does not provide a basis for changing the Administrative Law Judge's decision." [AR 1-2 (emphasis added)] The "Order of Appeals Council" lists the February 3, 2010, letter and its attached exhibits. [AR 4]

Tenth Circuit law requires only that the Appeals Council consider properly submitted evidence that is new, material, and temporally relevant. *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003); *see* 20 C.F.R. § 404.970(b). "If the Appeals Council fails to consider qualifying new evidence, the case should be remanded for further proceedings." *Threet*, 353 F.3d at 1191.  By contrast, if, as happened here, "the Appeals Council explicitly states that it considered the evidence,

there is no error, even if the order denying the review includes no further discussion." *See Martinez v. Astrue*, 389 Fed App'x 866 (10th Cir. 2010) (unpublished) (citing *Martinez v. Barnhart*, 444 F.3d 1201, 1207-08 (10th Cir. 2006) (noting that analysis of new evidence by the Appeals Council was not required)); *cf. Threet*, 353 F.3d at 1191-92 (reversing and remanding where Appeals Council gave no indication that it considered qualifying new evidence)). I take the Appeals Council at its word "when it declares that it has considered a matter." *Hackett*, 395 F.3d at 1173.

I therefore find that the Appeals Council did not error with respect to this issue.

### E. Cross-Examination of Vocational Expert

Plaintiff's sixth claim of error involves the hearing, specifically a question that the ALJ precluded Plaintiff's attorney from asking while cross-examining the vocational expert (the "VE"). I conclude that the ALJ did not reversibly err.

In response to direct examination by the ALJ, the VE had opined that, for a hypothetical person with Plaintiff's age, education, past, and past working experience, and with lifting and carrying limitations requiring him to work sedentary jobs, there were jobs existing in significant numbers in the national or regional economy. [AR 52-55] The VE gave two examples of such jobs: a call-out operator and telephone information clerk. [AR 53-53]

After the ALJ finished the direct examination, Plaintiff's lawyer commenced his cross-examination. Plaintiff's lawyer attempted to ask the VE whether the size of these jobs would erode if the hypothetical claimant was required to change positions every 15 minutes. [AR 56] Before the VE could respond, the ALJ interjected, and the following exchange occurred:

ALJ: "You don't have to — don't answer the 15 minutes. There isn't any evidence in this file or in the testimony that Claimant talks about having to get up every 15 minutes . . . .

Plaintiff's Attorney: Your Honor, just to clarify, Dr. Irish, in her July 1st, 2008, report, specifically defined what she previously said as being able to change positions as needed, to position changes every 15 minutes.

ALJ: All right. And we've now got testimony from your Claimant, as well as other places in the file, indicating a half hour to 45 minutes so [sic] I guess what I'm telling you is I don't think there's any basis for support for Dr. Irish's statement. . . . Next question?

[AR 55-56] Plaintiff argues that both Drs. Irish and Nystrom had opined that Plaintiff should change positions every 15 minutes and that this limitation is material because the VE's opinion on the availability of jobs for a hypothetical claimant matching Plaintiff's characteristics may have changed.

At a Social Security hearing, the ALJ shall allow the claimant or his designated representative to "ask the witness any questions material to the issues." 20 C.F.R. § 404.950(e). Hypothetical questions, however, "should include all- and only- those impairments borne out by the evidentiary record." *Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995). It follows, then, that an ALJ is not required to include in a hypothetical question limitations "not accepted by the ALJ as supported by the record." *Id.* Nor must he "accept the answer to a hypothetical question that included limitations claimed by plaintiff but not accepted by the ALJ as supported by the record." *Id.*

I find that the ALJ did not commit reversible error. Plaintiff is correct that both Dr. Irish and Dr. Nystrom opined this limitation. [*See* 473, 495] But the ALJ did not accept the limitations as supported by record; that is the hurdle the limitation must have passed, not merely being found somewhere in the record. *Bean* , 77 F.3d at 1214. He accorded both opinions "little weight." [*See* AR 18-19] The weight accorded Dr. Nystrom's opinion is supported by substantial evidence. *See* Part VI.A.1, *supra*. For the reason below, I need not decide whether the weight accorded Dr. Irish's

opinion is similarly supported.  I note, however, that the reasons the ALJ proffered for discounting Dr. Irish's opinion were already found to be specific, legitimate, and good when reviewing the weight given to Dr. Nystrom's opinions. *See* Part IV.A.1, *supra*.

Assuming, *arguendo*, that the ALJ should have accepted Dr. Irish's limitation, that still does not warrant reversal. Plaintiff argues that had the ALJ allowed the question, the VE may have testified that substantial jobs in the regional or national economy no longer existed for the hypothetical person.  This, Plaintiff asserts, may have persuaded the ALJ to find a different RFC.

The defect in this argument is at once patent and nuanced. As outlined above, the ALJ engages in a lock-step analysis to determine whether a claimant is disabled for purposes of Social Security benefits. Before Steps Four and Five, the ALJ has evaluated and weighed all the medical evidence, including opinions, and constructed an RFC therefrom.  The ALJ brings his determined RFC to the VE to complete Steps Four and Five.  The ALJ therefore does not construct the RFC using the VE's opinions. *See, e.g.*, *Bean*, 77 F.3d 1214 ("The VE relied on the limitations found by the ALJ . . . .") It follows, then, that the VE's opinions would not have "persuaded" the ALJ to render a different RFC.  This makes any error harmless, for the VE's opinion would not change how the ALJ weighted Drs. Nystrom's and Irish's opinions because he weighed them prior to the VE.

Accordingly, I find that this was not reversible error.

### F. The ALJ's Overall Approach to Medical Opinions

Plaintiff's seventh and final claim of error is broad.  In essence, Plaintiff contends that, when evaluating what weight to accord a medical source opinion, the ALJ inconsistently considered the source's treatment relationship with him.  Plaintiff states that the ALJ discounted Dr. Nystrom's opinion because of the gap in treatment.  Contrast this with, Plaintiff asserts, with the weight the

ALJ gave Dr. Susman's and Dr. Young's opinions.  He gave Dr. Susman's opinion "great weight" despite an absence of an examining and treatment relationship.  He gave weight to Dr. Young's opinion even though Dr. Young last saw Plaintiff in 2006–three years before the ALJ rendered his decision.  But then the ALJ discounted Drs. Hughes' and  Fillmore's opinions, which derived from single examinations, while crediting Dr. Mabe's thorough, but single, examination.

The framework for weighing medical opinions is in Part VI.A.1, *supra*.  I incorporate it by reference here.

Plaintiff's argument is fatally flawed.  Firstly, insofar as the claim of error hinges on the weight the ALJ accorded Dr. Susman's opinion, the claim is now moot as I have remanded this matter with respect to that determination.  *See* Part VI.B, *supra*.

Secondly, the contrast Plaintiff tries to draw between Drs. Nystrom and Young to show inconsistency is both overstated and inapt. It is overstated because the ALJ accorded Dr. Young "some weight," just slightly more than that accorded to Dr. Nystrom's MSS opinion.  [AR 18] The ALJ was also measured in weighing Dr. Young's opinions. He noted that Dr. Young's last salient opinion is from April 2006, and he cabined the limited weight he gave to only those opinions regarding Plaintiff's physical abilities. [*See* AR 18]

Plaintiff's contrast is also inapt.  He asserts that Dr. Young last saw Plaintiff in 2006, three years before the ALJ rendered his decision.  This gap, he says, is much larger than the gap in Dr. Nystrom's treatment, a gap for which the MSS opinion was discounted.  This conflates a subtle but crucial distinction.  The "gap" Plaintiff refers to with respect to Dr. Young is the time between the last time Dr. Young saw him and the ALJ's decision.  This is not the breed of "gap" for which the

ALJ discounted Dr. Nystrom's MSS opinion; that gap was the time period between the MSS opinion and the prior treatment or exam.  Plaintiff is thus comparing two different things.

Thirdly, the comparison between Drs. Hughes and Fillmore with Dr. Mabe also fails to support this claim of error.  Drs. Hughes and Fillmore actually opined as to Plaintiff's physical abilities and limitations. [*See* AR 18]  Dr. Mabe only opined that Plaintiff needed a cane on uneven surfaces.  [*See* AR 18-19] The ALJ indeed discounted  Dr.  Fillmore's opinion in part because it derived from "only one examination." [*See* AR 18] But, despite what Plaintiff asserts, he did not "credit" Dr. Mabe's opinion at all, let alone because it stemmed from one exam.  The ALJ gave Drs. Hughes' and Fillmore's opinions "some weight;" he accorded Dr. Mabe's none. [*See* Ar 18-19] He simply noted the normal clinical findings and Plaintiff's stated capabilities in the report.  [AR 20]

Accordingly, I conclude that this argument fails to show an error. On remand, however, when the ALJ reweighs Dr. Susman's opinion, and any other medical opinion he revisits as a result thereof, I urge the ALJ to assiduously and consistently apply the pertinent § 404.1527 factors.

## VII. Conclusion

For the foregoing reasons, I REVERSE the Commissioner's final order with respect to the weight accorded to Dr. Susman's opinions, and I REMAND the matter to the Commissioner for further proceedings consistent with this order and judgment.

Dated: March   __14__, 2012, in Denver, Colorado.

BY THE COURT:

__s/Lewis T. Babcock_____
LEWIS T. BABCOCK, JUDGE